JOSEPH T. MCNALLY
Acting United States Attorney
LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division
ANNE C. GANNON
Assistant United States Attorney
Chief, Santa Ana Branch Office
MELISSA S. RABBANI (Cal. Bar No. 283993)
Assistant United States Attorney
     U.S. ATTORNEY'S OFFICE
        411 West Fourth Street, Suite 8000
        Santa Ana, California 92701
        Telephone: (714) 338-3500
        Facsimile: (714) 338-3561
        E-mail:    melissa.rabbani@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. SA CR 23-114-JWH |
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | Hearing Date: March 28, 2025 |
| HARISH SINGH SIDHU, aka "Harry Sidhu," | 2:00 p.m. |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Melissa Rabbani, hereby submits its position regarding sentencing.

The government's position is based upon the attached memorandum of points and authorities, the files and records in this case, the Presentence Report ("PSR") and disclosed recommendation letter filed

on February 28, 2025, and any other evidence or argument that the Court may wish to consider at the time of sentencing.

Dated: March 14, 2025                Respectfully submitted,

                                     JOSEPH T. MCNALLY
                                     Acting United States Attorney

                                      /s/ Melissa S. Rabbani
                                     MELISSA S. RABBANI
                                     Assistant United States Attorney

                                     Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

I.   INTRODUCTION....................................................1

II.  SUMMARY OF RELEVANT FACTS.......................................3

     A.   Defendant Betrayed the City of Anaheim During Stadium
          Sale Negotiations..........................................3

     B.   Defendant Deleted Evidence of His Conduct During
          Stadium Sale Negotiations..................................5

     C.   Defendant Acknowledged, in Recorded Calls, That He
          Expected Compensation for Helping the Angels...............5

     D.   Defendant Lied to Federal Agents about His Conduct
          During Stadium Sale Negotiations...........................6

     E.   Defendant Lied to the FAA to Avoid Paying Tax on a
          Helicopter Purchase........................................6

     F.   Defendant Resigned from the Mayorship and Pled Guilty
          to Four Felonies...........................................6

III. PRESENTENCE REPORT..............................................7

IV.  THE GOVERNMENT'S POSITION.......................................7

     A.   Nature, Circumstances, and Seriousness of the Offense......8

     B.   Defendant's History and Characteristics...................10

     C.   Supervised Release........................................11

     D.   Financial Obligations.....................................11

V.   CONCLUSION.....................................................11

**TABLE OF AUTHORITIES**

**CASES**

United States v. Barker,
    771 F.2d 1362 (9th Cir. 1985)...................................10

United States v. Martin,
    455 F.3d 1227 (11th Cir. 2006)...................................9

United States v. Onuoha,
    820 F.3d 1049 (9th Cir. 2016)...................................10

United States v. Stefonek,
    179 F.3d 1030 (7th Cir. 1999)...................................11

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

In 2018, the people of Anaheim elected defendant Harry Sidhu as their mayor. In that role, defendant swore to put the interests of the city above his own. But not long after his election, defendant began doing exactly the opposite.

In 2019 and 2020, defendant worked with others in city leadership to negotiate the sale of Angel Stadium to the Angels baseball team. The stadium sale was an incredible opportunity for the city, with the potential to bring in hundreds of millions of dollars.

Rather than work to ensure the city of Anaheim received the best deal possible from the Angels, defendant worked behind the scenes to make the potential deal better for the Angels – and as defendant later acknowledged in a recorded phone call, did so with the expectation that he would receive a significant campaign contribution of at least $1 million.

Knowing his conduct was wrong, and a betrayal of the city of Anaheim, defendant purposely deleted multiple emails relating to the stadium negotiation. And when he was first approached by the FBI about the negotiation, he lied – claiming that he did not recall sharing confidential information with the Angels and that he expected "nothing" from the Angels after the sale.

Based on his conduct, and a separate incident in which defendant knowingly made false statements to the FAA to avoid paying California tax on a helicopter, defendant pled guilty to four felonies: one count of obstruction of justice, two counts of making false statements to a federal agency, and one count of wire fraud.

The United States Probation Office ("USPO") filed a Presentence Report ("PSR") on February 28, 2025.  Dkt. 33.  The USPO determined that the total applicable offense level in this case is 12 and that defendant's criminal history is in category I, resulting in a guidelines range of 10 to 16 months of imprisonment.  Id. at 4.  The USPO recommends that the Court apply a significant downward variance and sentence defendant to three years of probation, as well as a total fine of $175,000 and the mandatory special assessment of $400.  Dkt. 32.

As set forth below, the government largely agrees with the USPO's calculations as to the applicable offense level in this case, but pursuant to the parties' plea agreement, the government respectfully recommends that the Court impose a one-level downward adjustment to the offense level based on defendant's early acceptance of responsibility in this case.  Thus, the government believes that the total offense level in this case should be 11, rather than 12, and that the applicable guidelines range is thus 8 to 14 months rather than 10 to 16.[1]

Importantly, however, the government does not agree that a variance down to a sentence of probation is appropriate here.  Defendant betrayed the City of Anaheim.  He deleted the evidence of his conduct and lied repeatedly to federal agents.  He lied again, later, simply to avoid paying sales tax on a helicopter.  Defendant did not engage in this criminal conduct out of desperation, or addiction, or because he had no better options: he did so to further

---

[1] There is no dispute that defendant's criminal history category is I.

2

his own political ambition and to save himself a relatively trivial amount of money.

To his credit, defendant has since accepted responsibility for his actions, resigned from office, and repaid the taxes he evaded. Defendant himself is unlikely to commit similar crimes in the future. But a term of imprisonment is absolutely necessary to sanction defendant's breach of the public trust and, perhaps most importantly, to promote respect for the law among wealthy and powerful individuals like defendant. See 18 U.S.C. § 3553(a). A significant downward variance sends a troubling message: it suggests that defendants who engage in white-collar, public-corruption crimes like this one can simply remove themselves from public life, pay a fine, and face minimal consequences, with incarceration reserved only for blue-collar, less-privileged defendants.

Thus, the government respectfully recommends that the Court impose a sentence of eight months' imprisonment, to be followed by a one-year period of supervised release. The government further recommends that the Court impose a fine of $40,000, to be paid within 90 days of sentencing, and a mandatory special assessment of $400.

**II.   SUMMARY OF RELEVANT FACTS**

The facts below are taken from the PSR and from the plea agreement filed on August 16, 2023. Dkts. 3, 33.

**A.   Defendant Betrayed the City of Anaheim During Stadium Sale Negotiations**

In 2019 and 2020, the city of Anaheim was negotiating a potential sale of Angel Stadium to SRB Management and the Los Angeles Angels professional baseball team (collectively, "the Angels").

Defendant sought to become, and became, a member of the city's negotiating team.

Without informing the rest of that team, defendant provided confidential inside information belonging to the city – including confidential negotiation information – to Todd Ament, who was then CEO of the Anaheim Chamber of Commerce, and to a consultant working for the Angels (the "Angels consultant"), so that the Angels could buy Angel Stadium from the city on terms beneficial to the Angels.

In particular, in 2019, defendant provided a confidential appraisal range related to Angel Stadium to Ament, with the intent that Ament give the appraisal information to the Angels to assist them in negotiations with the City.  Dkt. 3 at 12.

On July 21, 2020, defendant emailed a document entitled "4844-8343-9299.2 Key Issues – Stadium Transaction Agreement.docx" to Ament and the Angels consultant.  Dkt. 3 at 10.  That document, which was drafted by attorneys for the city, contained confidential and sensitive negotiation information related to the stadium sale, including a discussion of issues related to price and other purchase and sale terms.  For example, in a section entitled "Lease Assignment: Parking," the document advised:

> [The Angels] eliminate the requirement that they maintain at least 12,500 parking spaces – so upon closing they could immediately amend the lease to limit their parking obligation and then flip the land for millions more than they paid for it.  For example, reducing their parking obligation by 4,000 spaces would translate to $64M in increased land value. . . . [T]he City has publicly acknowledged that the purchase price would be much higher without this obligation.

Dkt. 3 at 10.  By providing that information to Ament and the Angels consultant, defendant was helping the Angels – and betraying the City – by advising the Angels of a potential avenue for reducing the

4

purchase price and/or maximizing the Angels' investment, at the expense of Anaheim citizens.

### B. Defendant Deleted Evidence of His Conduct During Stadium Sale Negotiations

Defendant knowingly deleted the July 2020 email described above. Dkt. 3 at 13. He also deleted a separate email he received in September 2020 from the Angels consultant. That email, which was sent to defendant's personal email address and copied Ament, two Anaheim City Council members, two City employees, the President and a Senior Vice President of the Angels, and others, was titled "Angels Deal Debate/Council Prep – ROUND 1." Dkt. 3 at 11. The email discussed mock City Council meetings to be held to prepare for an actual City Council meeting on the stadium sale; it stated that defendant was "expected to be a strong defender of the deal." Id. at 12.

### C. Defendant Acknowledged, in Recorded Calls, That He Expected Compensation for Helping the Angels

After secretly providing information to the Angels to help them get a better deal from the City, defendant acknowledged, in several phone calls that were recorded without his knowledge, that he expected compensation in the form of a campaign contribution.

On December 6, 2021, for example, defendant made the following statement:

> Because I, I've said, you gotta at least, minimum of a million dollars to come up with my election. They have to. And of course, you know, . . . if Angels project would conclude next year is approved hopefully, we'll push them for at least half a million dollars. You know, for [the Angels] to say "no" is bad, for them not to say no on that.

Dkt. 3 at 12-13.

On January 28, 2022, in another call, defendant reiterated:

5

> Because I am hoping to get at least a million from I'm going to be pushing it. [Angels representative] actually asked me. He said, "What can I do for your election?" I said, "Let me finish your deal first, and then we'll talk about that.

Dkt. 3 at 13. In that same call, defendant later added, "So I'm going to be asking for a million dollars from him . . . for my election." Id.

### D. Defendant Lied to Federal Agents about His Conduct During Stadium Sale Negotiations

FBI agents interviewed defendant regarding the stadium sale in May 2022. In that interview, defendant repeatedly lied, claiming that he did not recall providing information about the stadium sale to the Angels consultant; that he never used his personal email for City business; and that he was expecting "nothing" from the Angels after the sale. Dkt. 3 at 14.

### E. Defendant Lied to the FAA to Avoid Paying Tax on a Helicopter Purchase

In October 2020, defendant bought a used helicopter for approximately $205,000. In registering the helicopter with the FAA, defendant fraudulently represented that he resided in Arizona, even though he lived in Anaheim, California, and intended to hangar the helicopter in Chino, California – and did so only to avoid paying roughly $15,000 in California sales tax. Dkt. 3 at 15-16.

### F. Defendant Resigned from the Mayorship and Pled Guilty to Four Felonies

In May 2022, after the FBI's investigation became public, defendant resigned as mayor of Anaheim. Defendant quickly agreed to cooperate with the government and sat with government agents for a lengthy proffer session. In August 2023, agreed to plead guilty to the four counts in the Information.

6

**III. PRESENTENCE REPORT**

The USPO determined that the base offense level for the two obstruction-related counts is 14. Dkt. 33 at 16. The USPO then applied a two-level adjustment under U.S.S.G. § 2J1.2(b)(3)(B), because the offense "involved the selection of any essential or especially probative record, document, or tangible object, to destroy or alter." Id. After calculating the offense level for the two fraud-related counts as 11, the USPO applied a one-level multiple count adjustment, resulting in an offense level of 17. Id. at 17-18. After applying a three-level decrease for acceptance of responsibility, and a two-level decrease under the zero-point offender provision, the USPO arrived a total offense level of 12. Id. at 18-19.

The USPO calculated defendant's criminal history category as I, Dkt. 33 at 19-20, resulting in a Guidelines range of 10 to 16 months imprisonment, id. at 38.

In its disclosed recommendation letter, the USPO recommends a sentence of three years' probation – which would amount to a four-level variance – as well as a fine of $175,000 and a mandatory special assessment of $400.

**IV. THE GOVERNMENT'S POSITION**

The government agrees with the USPO's calculations as to the offense level applicable in this case, except that, pursuant to the parties' plea agreement, the government recommends an additional one-level variance based on defendant's early acceptance of responsibility in this case. See Dkt. 3 at 17. As set forth in the plea agreement, this recommended variance is based on defendant's (i) immediate resignation from the mayorship upon public disclosure of

7

the FBI's investigation; (ii) immediate repayment of the California sales tax he evaded, with penalties; and (iii) agreement to a pre-indictment plea, which includes "a robust factual basis and waives most appellate rights." Id.

In particular, the government agrees with the USPO that the two-level adjustment under U.S.S.G. § 2J1.2(b)(3)(B) should be applied here.[2] Defendant's own statement, submitted in the PSR, makes clear that he did, in fact, select essential or especially probative documents to destroy: "I deleted my emails to Mr. Ament because I was afraid that they would become public and make me look bad politically in my reelection campaign." Dkt. 33 at 13. Defendant sought out and selected the emails he was worried about, knowing that they could "look bad politically" if publicly disclosed because they would reveal he put his own interests above the City's, and deleted them intentionally.

With a total offense level of 11, and a criminal history category of I, the applicable guidelines range here is eight to 14 months of imprisonment. For the reasons set forth below, the government respectfully submits that a sentence of eight months' imprisonment is appropriate.

### A. Nature, Circumstances, and Seriousness of the Offense

As the mayor of Anaheim, defendant had a position of immense public trust – and wasted no time in violating that trust for his own benefit. The sale of Angel Stadium presented an opportunity to bring the City hundreds of millions in revenue and benefit its residents. Instead of working for the benefit of Anaheim's residents, however,

---

[2] The government understands that the defense intends to argue that this adjustment should not apply.

8

defendant followed the money and worked in the best interests of the Angels, a group he understood could benefit him in turn with large campaign contributions to keep his political career going.

Not only did defendant betray the City, but he deleted evidence of his conduct and repeatedly lied to federal agents when first approached.

Moreover, defendant's lies were not limited to political self-preservation.  Defendant lied to the FAA merely to save himself roughly $15,000 in California tax: surely a trivial sum for someone with the means to purchase a $200,000 helicopter.  Those lies suggest a troubling belief that defendant, and others with wealth and power, are above the law.

Since then, to his credit, defendant has accepted responsibility for his crimes.  He has left public office and is unlikely to run again.  But this Court must sanction defendant's breach of public trust – and perhaps more importantly, a significant sentence in this case is important in deterring others in defendant's position from committing similar crimes.

As the Eleventh Circuit recognized in United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006), white-collar crimes like defendant's generally are not "sudden crimes of passion or opportunity."  Rather, "[d]efendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment."  Congress, too, has recognized that deterrence is particularly important in white-collar cases, noting that when white-collar criminals are sentenced to "small fines and little or no imprisonment," it creates an unfortunate impression "that certain

9

offenses are punishable only by a small fine that can be written off as a cost of doing business." See S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259. See also United States v. Onuoha, 820 F.3d 1049, 1056 (9th Cir. 2016) (recognizing that general deterrence is "an important consideration" in sentencing); United States v. Barker, 771 F.2d 1362, 1368 (9th Cir. 1985) ("[P]erhaps paramount among the purposes of punishment is the desire to deter similar misconduct by others.").

The government respectfully submits that defendant's repeated breaches of public trust, and obstruction of justice, warrant a custodial term of imprisonment.

**B. Defendant's History and Characteristics**

The PSR details an impressive history, chronicling defendant's successful efforts, after immigrating to the United States at 17, to obtain an education, build a career, build a business, raise a family, and give back to the public.

The government submits, however, that defendant's personal history is aggravating, rather than mitigating. Unlike so many criminal defendants who appear before this Court, defendant did not turn to criminal activity out of desperation, addiction, or a dearth of better options. When defendant engaged in the criminal activity at issue here, he was a successful, well-educated, well-known, and well-liked businessman and politician, with considerable financial means. Defendant knew right from wrong and had the means, the ability, and the options to live any life he wanted. Unfortunately, he chose, time and again, to prioritize his political career and personal finances over doing the right thing or faithfully serving the public. See United States v. Stefonek, 179 F.3d 1030, 1038 (7th

Cir. 1999) (defendants who are able to "make a decent living without resorting to crime" are "more rather than less culpable than their desperately poor and deprived brethren in crime").

Defendant should not avoid a sentence of incarceration simply because of his accomplishments – accomplishments that should have made it easy for him to avoid engaging in criminal conduct.

### C. Supervised Release

The government recommends that the Court impose a one-year period of supervised release, following his release from custody.

### D. Financial Obligations

The government recommends that the Court impose a fine of $40,000: the high end of the range applicable to an offense level of 11 under the Sentencing Guidelines. See U.S.S.G. 5E1.2(c)(3). The government also recommends that the Court impose a mandatory special assessment of $400.

Because defendant has already repaid the taxes he evaded, no restitution order is necessary.

## V. CONCLUSION

As set forth above, the government respectfully recommends that the Court impose a sentence of eight months' custody, to be followed by a one-year period of supervised release, and order a fine of $40,000 and a mandatory special assessment of $400. The government submits that this sentence is sufficient, but not greater than necessary, to punish defendant, promote respect for the law, deter others from committing similar crimes in the future, and avoid sentencing disparities. See generally 18 U.S.C. § 3553(a).